## NELLIE STANTON v. MINNEAPOLIS STREET RAILWAY COMPANY.[1]

November 22, 1935.

No. 30,444.

*Ralph T. Boardman* and *John F. Dulebohn,* for relator.
*Sexton, Mordaunt, Kennedy & Carroll,* for respondent.

[1]Reported in 263 N. W. 433.

STONE, JUSTICE.

*Certiorari* to the industrial commission to review an order granting compensation for the death of respondent's husband, Mike Stanton.

For Mr. Stanton life came to an end about five o'clock p. m. of Sunday, October 15, 1933, in the course of his employment by the Minneapolis Street Railway Company, relator here. He was a long-time employe, having worked in the Lake street car barn since 1928. His principal tasks were those of utility repairman and electric control inspector. His was the duty to inspect and keep in repair the controls on 35 or 40 streetcars from time to time housed in the Lake street barn. In addition, he habitually worked with others of the crew in keeping the place clean and shoveling sand from work cars into sand chutes leading into a basement. The sand is brought in during the summer and stored for use as needed. He was shoveling sand at the time he died, just as he had regularly in the summertime during many years. His day off was Saturday. He worked eight hours a day, six days a week, including Sunday.

On the afternoon of October 15 he, with two fellow workers, Tomshek and Milliken, were removing sand from a work car into a chute leading to the storage basement. Two other employes had been working with them but had quit at four o'clock. The sand was damp, moistened to keep down the dust. The work was not being done hastily, the men shoveling for about 15 minutes and then resting for two or three. Stanton was using a lighter and smaller shovel than those of his two companions. They say that he, being older (he was 58), could not do and was not doing as much work as they. The Friday before he had complained of trouble with his "wind"—shortness of breath. That afternoon, during a rest period, the men had lighted cigarettes, and Stanton remarked that he might have to quit smoking. It was affecting his "wind." The sand going through the chute accumulated on the floor four feet below and piled up against the wall and clogged the chute. When three men were shoveling, it was customary to have another in the basement to keep the chute clear. The chute having

clogged when the car was about two-thirds empty, Stanton was directed by the acting foreman, Tomshek, to go down and clear it. Stanton appeared to be in his usual health. He went into the basement alone. The chute was promptly cleared. His companions on the car continued shoveling for at least five minutes, according to the testimony of both, when, the chute again clogging, a call to Stanton brought no reply.

Milliken went into the basement and found him dead, his body lying on the back, feet in the sand, the shoes covered with two or three inches of it, and the shovel standing upright with blade in the sand just in front of his feet. That is the whole ante-mortem story. There is no suggestion of accident or fortuitous event other than the death itself—no evidence of blow, sudden strain, more than ordinary exertion, excitement, or aught else to explain why death ensued.

An autopsy did expose the cause, coronary sclerosis with "a fairly recent thrombosis." In the heart itself "were several areas of extensive fibrosis, the muscles replaced by fibrous tissue." The anterior descending branch of the left coronary was completely closed. In that artery was much calcification of the wall, "in the center of the lumen [opening] there was a dark substance, which was a thrombosis * * *. The right coronary was completely closed, * * * due entirely to intimal thickening and calcification." All of these conditions had been of gradual development, save only the clot or thrombus.

The medical testimony for petitioner ascribes the thrombosis, not to any accident or fortuitous event, but solely to exertion, the opinion being that "over-exertion" caused death. But the term "over-exertion" is used only as indicating a degree of labor exceeding that which the doctors considered safe for any heart already as "tremendously damaged" as was Stanton's. Even so, their whole testimony comes near, if not quite, to being reducible to the arithmetical statement that there was a "fifty-fifty" chance that the man's work had nothing to do with his death; that is, in about one-half of such cases death is as likely to come while the victim is walking or under other slight physical stress, or even when he is

460

resting. Many such deaths have come without apparent connection with exertion of any kind, and even when the subject was in bed. There was admission from one of petitioner's doctors that "the majority of them" had died when they were not at work. We do not overlook the testimony of another that 50 per cent is "probably high" as an estimate of the number of such cases where death results without any particular work or exertion.

This summary of all medical testimony for petitioner indicates that, as to cause, the case even from the medical viewpoint is almost, if not quite, one of mere conjecture rather than reasonable inference. It comes close to leaving the evidence in such balance that petitioner has not sustained the burden of proof resting upon her to show the cause of death by fair preponderance of evidence. But we do not base decision upon that ground. We hold rather that there was no showing of accidental cause within the workmen's compensation law, which (1 Mason Minn. St. 1927, § 4326[h]) defines an accident as "an unexpected or unforeseen event, happening suddenly and violently, with or without human fault, and producing at the time injury to the physical structure of the body." Without stopping to examine the difference, if any, between that and "fortuitous event," used in argument (see Stertz v. Industrial Ins. Comm. 91 Wash. 588, 593, 158 P. 256, Ann. Cas. 1918B, 354), we hold that here was no accident within the meaning of our law.

A fortuitous event is one "happening by chance or accident; occurring unexpectedly, or without known cause." Webster's New International Dictionary, Unabridged (2 ed.) 1935, p. 994. Were that the literal and only test, all sudden deaths happening during the course of an employe's work would be compensable. Obviously, that is not the intent of our law else it would not have defined "accident" as it has. Furthermore, sudden death from disease, in the course of employment, would not have been ruled out, as it is.

Death itself may be unexpected or unforeseen, and so fortuitous. But, even with antecedent change in "physical structure," death alone does not justify compensation. It is the cause rather than the result which makes the latter compensable. There must be a sudden, violent, extraneous happening, which can be assigned by

reasonable inference rather than mere conjecture as the cause of death. Preceding Stanton's death, there was nothing of sudden or violent nature. We assume that the thrombosis itself was an injury to the physical structure of the body within the meaning of the statute. But, without accidental and extraneous causation of the sort made condition precedent to compensation, it is without consequence.

Aside from the not unusual circumstance that the doctors disagree, those testifying for relator being of opinion that nothing in Stanton's work contributed to his death, the facts are not in dispute. As said by Commissioner Debel, "There is no evidence of either over-exertion, undue exertion, or excessive strain in this case." There was no suggestion of external violence of any degree. Without such a factor of causation, there can be no recovery, a conclusion well substantiated by the very cases, heretofore decided by this court, upon which counsel for relator place much but mistaken reliance.

This case falls under the rule of Young v. Melrose Granite Co. 152 Minn. 512, 516, 189 N. W. 426, 428, 29 A. L. R. 506, wherein it was held that "the compensation act was not designed to cover cases where injuries result from ordinary overwork or too long continued effort without any sudden or violent rupture or collapse of some physical structure or function of the body." This case is even stronger for denial of compensation. Here is no evidence of even overwork. Without contradiction, it appears that the work was being done in a rather leisurely fashion, Stanton doing somewhat less than his share. The work in the basement, "pulling" the sand away from the chute, was obviously easier, and the evidence makes it so appear, than shoveling into the chute from the car.

Decisions elsewhere, under a similar statutory distinction between accident and disease as causes of disability, are in accord. Acceleration of disease by "ordinary and usual conditions" of work rather than some "sudden or extraordinary strain or fortuitous happening" do not make the resulting death compensable. Pierce v. Phelps Dodge Corp. 42 Ariz. 436, 26 P. (2d) 1017, 1019. "The right of recovery * * * cannot be determined upon the theory that

the work in which the employe was engaged was heavy, or of a strenuous character." Industrial Comm. v. Franken, 126 Ohio State, 299, 301, 185 N. E. 199, 200. So also as to disability from disease, "overtaking an employe at his work * * * unless the result of accident." Gausman v. R. T. Pearson Co. 284 Pa. 348, 354, 131 A. 247, 249. Same holding as to "heavy work" unrelated to accident, Jakub v. Industrial Comm. 288 Ill. 87, 90, 123 N. E. 263.

Basically the sunstroke cases, e. g., State ex rel. Rau v. District Court, 138 Minn. 250, 164 N. W. 916, L. R. A. 1918F, 918, are in a category by themselves. In them the external violence and its effect clearly appear. The hernia cases are as plainly distinguishable. In Klika v. Independent Sch. Dist. No. 79, 161 Minn. 461, 462, 202 N. W. 30, the employe was pushing a heavily loaded wheelbarrow through "sticky gumbo." According to his own testimony, the wheel "went in a hole, got locked full of dirt, and I pushed him with all my strength, then I felt a kind of pain in my side right away * * * and something tear right on the side here." There was plain evidence of unusual overexertion, with simultaneous manifestation of pain and injury, adequate to support a finding of accidental injury within the law. It was immaterial that Klika had a congenital or acquired condition predisposing him to rupture. It is equally no obstacle to recovery here that Stanton's heart for long had been "tremendously damaged." But it is both material and determinative that there is no evidence of [161 Minn. 464] "unusual strain or overexertion attendant upon the work," assignable as cause of death. That is the gist of the matter. That Stanton's ordinary work may have contributed to his death is not enough.

Coming nearer the argument for compensation is Kallgren v. C. W. Lunquist Co. 172 Minn. 489, 216 N. W. 241. That was a case of arteriosclerosis, but the injuries resulted from the lifting of a heavy beam which contributed to a stroke of apoplexy. So also in Krenz v. Krenz Oil Co. 186 Minn. 312, 314, 315, 243 N. W. 108, there was overexertion and "almost instantaneous connection" with "the collapse." The employe was "young and healthy," and the unusual strain had ruptured, suddenly and violently, "a blood

vessel in the brain." Other cases cited for the petitioner, such as Bauman v. Roth Downs Mfg. Co. 177 Minn. 98, 224 N. W. 459; Walker v. Minnesota Steel Co. 167 Minn. 475, 209 N. W. 635; and Farrell v. M. C. Ragatz & Sons Co. 189 Minn. 573, 250 N. W. 454, are distinguishable upon similar grounds. So also is Wicks v. Northland M. & I. C. Co. 184 Minn. 540, 543, 239 N. W. 614, where the connection between "severe strain and muscular exertion" and the initiation of "an attack of angina pectoris" was apparent.

To allow compensation in this case would establish a precedent which, if followed, would so result in any case where an employe came to his death during normal employment, simply because his heart stopped functioning because of disease. Such a decision is expressly forbidden by 1 Mason Minn. St. 1927, § 4327(3), reading thus:

"Neither the employe nor his dependents shall be entitled to compensation for disability or death resulting from disease unless the disease is due to the nature of his employment and contracted therein within the twelve months previous to the date of disablement, whether under one or more employers."

The enumeration of compensable, "occupational diseases" by subd. (9) of that section excludes arteriosclerosis and thrombosis.

Order reversed.